**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NIKE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NEW BALANCE ATHLETICS, INC.,<br><br>Defendant. | No. 1:23-cv-12666-JEK |

## MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

**KOBICK, J.**

Plaintiff Nike, Inc. brings this patent infringement action against defendant New Balance Athletics, Inc. for allegedly infringing certain of its patents involved in its Flyknit footwear technology. Pending before the Court are the parties' claim construction briefs contesting four claim terms. For the reasons that follow, the Court construes "article of footwear" to require an upper and a sole structure and thus exclude hosiery, stockings, and socks; "a [flat] knit textile element" to mean "a [flat-]knit, textile element that has not been cut from a larger textile web" and is therefore composed of only flat knit edges; "a non-textile element secured to a second portion of the flat knit textile element defining the heel region of the upper" to mean "a non-textile element secured to a second portion of the flat knit textile element that defines the heel region of the upper"; and "ankle part for covering at least a portion of an ankle of the wearer" according to its ordinary and customary meaning.

## BACKGROUND

The Court assumes the parties' familiarity with the underlying facts. *See* ECF 51, 108. In short, Nike filed this action in November 2023 alleging that New Balance has infringed the

following nine patents, literally or under the doctrine of equivalents: U.S. Patent Nos. 8,266,749 (the "'749 patent"), 8,898,932 (the "'932 patent"), 9,060,562 (the "'562 patent"), 9,510,636 (the "'636 patent"), 9,730,484 (the "'484 patent"), 9,907,350 (the "'350 patent"), 9,918,511 (the "'511 patent"), 9,924,758 (the "'758 patent"), and 11,707,105 (the "'105 patent"). ECF 1, ¶¶ 11, 21-94. In August 2024, the Court denied New Balance's partial motion to dismiss Nike's claims concerning the '350, '511, and '758 patents. ECF 51.

The Court stayed this case in June 2025 pending *inter partes* review ("IPR") of the '749, '932, '562, '636, '484, and '511 patents. ECF 108. In August 2025, the parties jointly stipulated to dismissal of all claims and counterclaims relating to the '484 patent, which the Patent Trial and Appeal Board ("PTAB") had previously found unpatentable. ECF 112; *see* ECF 113, at 2 n.1. The Court continued the stay that same month to permit Nike to appeal PTAB's separate decision finding the '749 patent unpatentable. ECF 111, 114. Nike voluntarily terminated that appeal in May 2026, which rendered PTAB's decision final. ECF 118, at 1. That same month, the parties jointly stipulated to dismissal of all claims and counterclaims relating to the '749 patent, and the Court lifted the stay and set a schedule. ECF 117, 119, 120. A claim construction hearing was held in September 2026. ECF 128.

**DISCUSSION**

The "'construction of a patent, including terms of art within its claim,' is not for a jury but 'exclusively' for 'the court' to determine." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)). Claims are generally given "the 'ordinary and customary meaning . . . that the term would have to a person of ordinary skill in the art in question at the time of the invention.'" *Trs. of Columbia Univ. in City of New York v. Gen Digital Inc.*, 169 F.4th 1320, 1333 (Fed. Cir. 2026) (quoting *Phillips v. AWH*

*Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)).[1] Such meaning is principally construed based on the intrinsic evidence—namely, "the claims, specification, and prosecution history." *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 130 F.4th 1372, 1379, 1383 (Fed. Cir. 2025). "Extrinsic evidence, including expert and inventor testimony, dictionaries, and treatises," may also be consulted, but it is "less significant than the intrinsic record" and thus cannot "be used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *ParkerVision, Inc. v. Qualcomm Inc.*, 116 F.4th 1345, 1357 (Fed. Cir. 2024) (quotation marks omitted). "Ultimately, the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Wyeth LLC v. AstraZeneca Pharms. LP*, 180 F.4th 1371, 1377-78 (Fed. Cir. 2026) (citation modified).

Here, the parties dispute the proper construction of four claim terms in the seven patents now at issue.[2] The Court addresses those terms in turn.

## I. "article of footwear"

The parties first dispute the construction of the term "article of footwear" in the '932, '562, '636, '350, '511, and '758 patents. Nike argues that the term should be given its ordinary and customary meaning to include an upper and a sole structure and thus exclude hosiery, stockings,

[1] While not applicable here, there are "two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *DDR Holdings, LLC v. Priceline.com LLC*, 122 F.4th 911, 915 (Fed. Cir. 2024) (quotation marks omitted).

[2] In February 2025, the parties stipulated to the construction of ten terms and, after filing their joint chart, agreed that the phrase "substantially planar" in the '749 patent should be given its ordinary and customary meaning. ECF 77, at 1 n.2; ECF 79, at 17; *see* ECF 73. With the subsequent dismissal of all claims and counterclaims regarding that patent in May 2026, however, the other terms—"surrounding [knitted] textile structure" and "the longitudinal edges are joined together"—in the '749 patent are no longer at issue either. *See* ECF 117; ECF 73, at 1-2.

and socks. New Balance, on the other hand, contends that the term should be construed to mean any foot covering in the form of shoes, boots, slippers, or hose.

The intrinsic evidence overwhelmingly supports Nike's proposed construction. Claim 1 of the '932 and '636 patents, for example, disclose an "article of footwear having an upper and a sole structure secured to the upper." ECF 80-2, at 18:35-36; ECF 80-4, at 25:2-3. The background sections of the'350, '511, and '758 patents explain that "[c]onventional articles of footwear include two primary elements, an upper and a sole structure." ECF 80-6 and ECF 80-7, at 1:40-41; ECF 80-8, at 1:39-40. The summary section of the '932 patent similarly states that an "article of footwear has an upper and a sole structure secured to the upper." ECF 80-2, at 2:14-15. Hose, stockings, and socks lack such a sole structure. *See, e.g.*, *id.* at 4:50-51 ("The primary elements of sole structure 110 are a midsole 111, an outsole 112, and a sockliner 113."). The specifications of the '562 and '636 patents also distinguish between footwear and socks, explaining that "[i]n addition to footwear, the knitted components may be used in other types of apparel (e.g., . . . socks . . . )." ECF 80-3, at 4:62-64; ECF 80-4, at 4:65-67.[3]

New Balance resists this conclusion by pointing to a statement in the '484 patent, which the PTAB found unpatentable, that "[o]ne *example* structure according to this invention relates to an article of footwear having an upper and a sole structure secured to the upper." ECF 80-5, at 3:10-12 (emphasis added). If an *example* of an article of footwear includes an upper and sole structure, New Balance argues, an article of footwear need not contain only those elements. But

[3] Invoking three unrelated patents, New Balance argues that socks can be both footwear and apparel. But "footwear," as used in those patents, "need not have the same meaning" as the patents here ascribe to the term. *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed. Cir. 2005). And since that term's meaning "is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence," including a dictionary definition. *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (quotation marks omitted).

that statement from a since-invalidated patent—which appears in the summary section, "where full explanations of the term are not expected"—does not "justify a broader reading" of the contested term. *InterDigital Commc'ns, Inc. v. U.S. Int'l Trade Comm'n*, 601 F. App'x 972, 978 (Fed. Cir. 2015). To the contrary, it explicitly ties an "article of footwear" to "an upper and a sole structure."

New Balance next turns to the abstracts of the '350, '511, and '758 patents, which summarize that the "article of footwear . . . *may include* an upper and a sole structure." ECF 80-6, ECF 80-7, and ECF 80-8, at 1 (emphasis added). While "the abstract of a patent is a potentially useful source of intrinsic evidence as to the meaning of a disputed claim term," *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 965 n.2 (Fed. Cir. 2000), its "purpose . . . is to enable the [Patent] Office and the public generally to determine quickly from a cursory inspection the nature and gist of the technical disclosure," 37 C.F.R. § 1.72(b). The abstract from these patents cannot therefore "override the clear language in the body of the specification," which discloses an article of footwear as including—not just potentially including—an upper and a sole structure. *Quectel Wireless Sols. Co. v. Koninklijke Philips N.V.*, No. 2023-1155, 2024 WL 2064617, at *3 (Fed. Cir. May 9, 2024); *see MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 151 (Fed. Cir. 2011) ("[T]he general language in the abstract . . . does not represent the full scope of the embodiments in the specification."). Nor can Nike's similar statements in the '562 and '636 patents that, "[i]n some embodiments, article of footwear 100 *may include* a sole structure 110 and an upper 120." ECF 80-3, at 5:21-22 (emphasis added); ECF 80-4, at 5:24-25 (emphasis added). That is so because "a particular embodiment appearing in the written description may not be read into a claim . . . if the claim language is narrower than the embodiment." *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1343 (Fed. Cir. 2020) (quotation marks omitted). The ordinary meaning of "article of footwear" is also the meaning ascribed by "the ordinary artisan

*after reading the entire patent*." *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1330 (Fed. Cir. 2021) (quotation marks omitted and emphasis added).

Accordingly, the term "article of footwear" must include an upper and a sole structure and therefore excludes hosiery, stockings, and socks. This construction is consistent with PTAB's decision in New Balance's IPR proceeding. *See* ECF 88-1, at 14, 24 (construing "article of footwear" as used in the now abandoned '749 patent to include "a sole structure and an upper"). It also accords with another district court's construction of the term and with Federal Circuit precedent. *See Nike, Inc. v. Skechers U.S.A., Inc.*, No. 23-cv-9346-AB-PVC, 2025 WL 4231623, at *5 (C.D. Cal. Dec. 16, 2025) (for the '749, '562, '636, and '511 patents, holding that "an 'article of footwear' must include 'an upper and a sole structure'" and "does not include socks"); *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1329 (Fed. Cir. 2016) ("Articles of footwear generally consist of two primary components: a sole structure and an 'upper.'"), *overruled on other grounds by Aqua Prods., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017).

## II. "a [flat] knit textile element"

The parties next contest the construction of the term "a [flat] knit textile element" in the '350, '511, and '758 patents. The '350 patent, like the '511 and '758 patents, recites "a flat knit textile element having . . . flat knit edges free of surrounding textile structure such that the flat knit edges are not surrounded by textile structure from which the flat knit textile element must be removed." ECF 80-6, at 12:10-13, 12:43-46; *see* ECF 80-7, at 12:12-15, 13:3-6; ECF 80-8, at 12:12-15, 12:53-56. In *Nike, Inc. v. Adidas AG*, the Federal Circuit construed this same language in a prior related patent, U.S. Patent No. 7,347,011 (the "'011 patent"), and held that "the broadest reasonable interpretation of 'flat knit edge' is 'an edge of a flat knit textile element, which is itself flat knit, e.g., which is not formed by cutting from a flat knit textile element.'" 812 F.3d at 1346-

47. "An interpretation that included a flat-knit, textile element that has been cut from a larger textile web," the Federal Circuit added, "would contradict the express claim language." *Id.* at 1346.

The parties agree with the Federal Circuit's construction of the term "flat knit edges." *See* ECF 73, at 3-4. As Nike's counsel acknowledged at the hearing, they further agree that the term "flat knit textile element"—disputed here—should be construed, consistent with *Nike*, to mean "a [flat-]knit, textile element that has not been cut from a larger textile web." *Id.* at 1. The parties part ways on what that construction requires—namely, whether the flat knit textile element must contain *only* flat knit edges. New Balance says that *all* edges of the flat knit textile element must be knit to shape or, put otherwise, that *none* of the edges can be cut from a larger textile. Acknowledging that the plural term "flat knit edges" is used to describe the "flat knit textile element," Nike contends that the flat knit textile element need only have *at least two* flat knit edges. If two or more edges are knit to shape and others are cut from a larger textile, Nike argues, that would still fall within the scope of its claimed technology.

New Balance has the better argument. The disputed term "a [flat] knit textile element" is defined as having "flat knit edges," and those edges cannot be cut from "surrounding textile." Contrary to Nike's proposed construction, the '350, '511, and '758 patents do not disclose that this element must contain at least two flat knit edges or may include edges cut from a larger textile. Rather, it recites that the flat knit textile element has flat knit edges. Interpreting identical claim language in the '011 patent, the Federal Circuit explained in *Nike* that "the scope of th[e] claim is limited to a flat-knit, textile element where the flat knit edges have not been removed, or cut, from a surrounding textile structure." 812 F.3d at 1346. It also considered whether that patent's disclosures "allow persons of ordinary skill in the art to recognize that the inventor invented a flat-knit, textile with flat-knit edges that are knit to shape rather than being cut from a larger textile

web." *Id.* at 1348. Even though the Federal Circuit did not expressly declare that those edges must *all* be flat knit, its statements strongly suggest that to be the best construction of the claim language, and nothing in its *Nike* decision supports Nike's construction of "a [flat] knit textile element" here. *See Skechers*, 2025 WL 4231623, at *7 (for the '511 and '758 patents, construing "flat knit textile element" to require that "all of the edges must be 'flat knit'" such that "none of the edges are cut from surrounding textile").

Nike protests that "a [flat] knit textile element" should be read more broadly because the '350, '511, and '758 patents disclose that "[t]extile element 40 may be formed as a part of a larger textile element" and "then removed from the larger textile element." ECF 80-6 and ECF 80-7, at 5:66-6:1; ECF 80-8, at 5:65-67. But this disclosure concerns a "textile element" generally, and not "a [flat] knit textile element" specifically. These patents, like the '011 patent at issue in *Nike*, distinguish "between textile elements that are removed from a larger textile web and those that are not." 812 F.3d at 1349. In the former situation, as exemplified in Figure 9, the "textile element 40 is . . . removed from textile structure 60" through "a wide-tube circular knitting machine." ECF 80-6 and ECF 80-7, at 7:64-66, 8:31-33; and ECF 80-8, at 7:63-65, 8:31-33. In the latter situation, as shown in Figures 8, 10, and 11, the textile element is formed through seams or stitches and thus without cutting. *See* ECF 80-6 and ECF 8-7, at 6:14-17, 6:35-38, 9:34-36, 9:58-60; ECF 80-8, at 6:13-16, 6:34-37, 9:34-36, 9:58-60. Relying on identical claim language and figures from the '011 patent as well as Nike's expert opinions, the Federal Circuit characterized this situation in which textile elements are "knit to the shapes shown in these figures (*i.e.,* without surrounding textile structure)" and not therefore "formed as part of a larger textile structure from which [they] must be removed" as "flat knitting." *Nike*, 812 F.3d at 1348-49 (quotation marks omitted); *see* ECF 80-6, ECF 80-7, and ECF 80-8, at 13-16. It further observed that "a circular knit upper, as

distinguished from flat knit, must be removed from surrounding textile material by, for example, cutting." *Nike*, 812 F.3d at 1349. The distinction between circle knit and flat knit is material: while a circle knit textile element could be cut from a larger textile web and thus contain edges that are cut to shape, a flat knit textile element cannot.

Accordingly, the intrinsic evidence and the Federal Circuit's decision in *Nike* support New Balance's proposed construction. The term "a [flat] knit textile element" will be construed as "a [flat-]knit, textile element that has not been cut from a larger textile web" and is therefore composed of only flat knit edges.

## III. **"a non-textile element secured to a second portion of the flat knit textile element defining the heel region of the upper"**

The parties also dispute the construction of the term "a non-textile element secured to a second portion of the flat knit textile element defining the heel region of the upper" in claims 1 and 9 of the '350 patent. Their disagreement concerns whether the "non-textile element" or "the flat knit textile element" must "defin[e] the heel region of the upper." New Balance argues that the non-textile element must define the heel region of the upper, such that the term should be interpreted to mean "a non-textile element that defines the heel region of the upper and is secured to a second portion of the flat knit textile element." ECF 73, at 2. Nike, on the other hand, contends that the textile element must define the heel region of the upper, such that the term should be read to mean "a non-textile element secured to a second portion of the flat knit textile element that defines the heel region of the upper."

The intrinsic evidence supports Nike's construction. Claims 1 and 9 of the '350 patent both recite "a non-textile element secured to a second portion of the flat knit textile element defining the heel region of the upper." ECF 80-6, at 12:17-19, 12:50-52. Under the specification, "[h]eel region 35 forms a rear portion of upper 30 and is generally configured to contact and cover a heel

area of the foot." *Id.* at 5:52-54. Upper 30, in turn, "is at least partially formed from textile element 40, which forms regions 31-35, and may also include laces or other [non-textile] elements." *Id.* at 5:58-60. Heel region 35 is therefore formed by that textile element.

Pointing to the specification's statement that non-textile "[e]lement 134 extends around the heel region to counter movement of the heel and seat the heel above sole structure 120," New Balance maintains that this non-textile element defines the heel region. *Id.* at 10:51-53. But Figure 12, upon which New Balance relies, shows that non-textile element 134 is attached to only a portion of the heel region. *See id.* at 17. And, as Figures 1 and 2 reveal, heel region 35 covers the entire length from the sole to the ankle opening. *See id.* at 8-9. The abstract similarly states that "[t]he textile element may have . . . non-textile elements . . . in the heel area," which suggests that those non-textile elements do not define the whole heel region. *Id.* at 1; *see Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.* (Fed. Cir. 2000) (courts may "loo[k] to the abstract to determine the scope of the invention").

New Balance next highlights another statement from the specification that upper 130 includes both "a textile element 140 having the general configuration of textile element 40," which "is a single material element with a unitary construction," as well as "a lace 131 and a plurality of [non-textile] elements 132-135." ECF 80-6, at 6:64-65, 10:38-40, 10:42-43. Since "the textile element is a unitary element and forms the entire upper 130," New Balance argues, "it simply cannot 'define' the heel region of the upper." ECF 77, at 11. Other language in the '350 patent, however, discloses that a textile element "forms" the heel region. ECF 80-6, at 5:52-54, 58-59. The phrase "defining the heel region of the upper" also appropriately draws the reader's attention to that "portion of the flat knit textile element," rather than, in the prior clauses, the "first portion of the flat knit textile element defining a forefoot region of the upper." *Id.* at 12:15-19, 12:48-52.

New Balance additionally contends that its construction is needed in light of Nike's infringement claims for shoes that, in its view, lack "a non-textile element" "defining the heel region." But a "'claim is construed in the light of the claim language . . . *not* in light of the accused device.'" *Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1309 n.10 (Fed. Cir. 2006) (quoting *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc)). Rejecting New Balance's construction, the Court construes the disputed term to mean "a non-textile element secured to a second portion of the flat knit textile element that defines the heel region of the upper."

**IV. <u>"ankle part for covering at least a portion of an ankle of the wearer"</u>**

The parties finally contest the construction of the term "ankle part for covering at least a portion of an ankle of the wearer" in claims 11 through 14 of the '932 patent. Nike seeks to afford this term its ordinary and customary meaning. New Balance, in contrast, contends that the term should be construed to mean "portions of the upper that are intended to cover and extend above the lateral malleolus and the medial malleolus of the wearer." ECF 73, at 2.

New Balance's proposed construction comes primarily from the portion of the '932 patent's specification stating that, "[i]n many configurations of footwear 100, ankle region 107 corresponds with portions of upper 120 that are intended to cover and extend above the lateral malleolus and the medial malleolus." ECF 80-2, at 14:41-44. But "the clai[m], not the specification, provide[s] the measure of the patentee's right to exclude." *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc). And the claim language here references "covering" but not does not use the words "intended" or "extend" at all. The Court should not "import into a claim limitations that are not a part of the claim," particularly where, as here, "the claim language is broader than the embodiment." *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364-

65 (Fed. Cir. 2003). This specification's reference to "many"—but not *all*—configurations is insufficient to limit the broader ordinary meaning of the disputed term. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347 (Fed. Cir. 2009) ("the only detailed embodiments in the patent" were "not enough . . . to limit the patentee's clear, broader claims"); *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1283 (Fed. Cir. 2012) ("the claims should not be confined to the disclosed embodiments—even when the specification discloses only one embodiment").[4] This term will, accordingly, be afforded its ordinary and customary meaning.

**CONCLUSIONS AND ORDERS**

For the foregoing reasons, the Court construes the term "article of footwear" to require an upper and a sole structure and therefore exclude hosiery, stockings, and socks; the term "a [flat] knit textile element" to mean "a [flat-]knit, textile element that has not been cut from a larger textile web" and is thus composed of solely flat knit edges; the term "a non-textile element secured to a second portion of the flat knit textile element defining the heel region of the upper" to mean "a non-textile element secured to a second portion of the flat knit textile element that defines the heel region of the upper"; and the term "ankle part for covering at least a portion of an ankle of the wearer" according to its ordinary and customary meaning.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: October 19, 2026

[4] New Balance separately contends that its construction is necessary given Nike's claims alleging infringement of shoes that, from its vantage point, do not cover any portion of a person's ankle. But "it is not appropriate for the court to construe a claim solely to exclude the accused device." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1367 (Fed. Cir. 2008).